IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

**ZACHARY CHRISTOPHER WALLACE,**

     **Plaintiff,**

**v.**                                                  **Case No.: 3:20-cv-00383**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**

     **Defendant.**


**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 14, 19).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for

judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

In April 2017, Zachary Christopher Wallace ("Claimant"), protectively filed for DIB and SSI, alleging a disability onset date of January 1, 1997 due to "Tourette's Syndrome, major depressive disorder, moderate anxiety, diabetes, neuropathy, and retinopathy." (Tr. at 234, 257). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 129-38, 143-58). Claimant requested an administrative hearing, which was held on February 14, 2019 before the Honorable Neil Morholt, Administrative Law Judge ("the ALJ"). (Tr. at 35-70). On June 13, 2019, the ALJ issued a written decision, finding that Claimant was not disabled as defined by the Social Security Act. (Tr. at 12-34). The ALJ's decision became the final decision of the Commissioner on April 9, 2020 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11). Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 14, 19). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 9 years old on his alleged onset date and 32 years old on the date of the ALJ's decision. (Tr. at 26). He communicates in English; completed college; and

previously worked as a telephone customer service representative. (Tr. at 256, 258).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent

the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the

4

impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2010. (Tr. at 18, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 1, 1997, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant's severe impairments included: diabetes mellitus with neuropathy, obesity, depressive disorder, adjustment disorder, and personality disorder. (*Id.*, Finding No. 3). The ALJ also considered Claimant's history of Tourette's syndrome, tachycardia, hyperlipidemia, hypothyroidism, retinopathy, degenerative disc disease, tendonitis, and

5

attention-deficit hyperactivity disorder (ADHD), but he found that the impairments were non-severe. (Tr. at 18-19). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 19-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: he can frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. He can occasionally climb ladders, ropes, or scaffolds. He must avoid frequent exposure to extreme cold, extreme heat, unprotected heights, and moving mechanical parts. He can have occasional interaction with supervisors and coworkers, and he can have no more than superficial work-related contact with the general public. He can understand, remember, and carry out simple, routine, repetitive, and one-to-three-step tasks. He can make simple work-related decisions in a routine work setting that has minimal variations.

(Tr. at 21-26, Finding No. 5).

At the fourth step, the ALJ determined that Claimant did not have any past relevant work. (Tr. at 26, Finding No. 6). Therefore, the ALJ reviewed Claimant's work experience, age, and education in combination with Claimant's RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 26-27, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1987 and was defined as a younger individual on the alleged disability onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of Claimant's transferable job skills. (Tr. at 26, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a commercial

cleaner, night cleaner, garment bagger, routing clerk, inspector, or sorter. (Tr. at 26-27, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 27, Finding No. 11).

IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts three challenges to the ALJ's analysis of his mental impairments. Specifically, he contends that substantial evidence does not support the ALJ's finding that he did not meet or equal a listing at step three of the sequential evaluation; the ALJ did not properly weigh the opinion of Claimant's treating psychologist; and the ALJ's RFC opinion is contrary to the substantial evidence of record. (ECF No. 14 at 11-17).

In response, the Commissioner asserts that the ALJ reasonably concluded that Claimant's mental impairments did not meet the criteria of any listing, properly evaluated the persuasiveness of the opinion evidence in accordance with the new regulatory framework, and included all of Claimant's credibly established functional limitations in the RFC assessment. (ECF No. 19 at 16-26).

V.    **Relevant Evidence**

The undersigned has examined all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

**A. Treatment Records**

On February 19, 2016, psychiatrist James Dumas, M.D., performed an intake evaluation of Claimant at Prestera Center, Inc. Claimant reported that he was treated for Tourette's Syndrome as a child, and his symptoms included vocal and motor tics. (Tr. at 366). He further stated that he did not like people, did not go out in public, and quit his job because he could not stand people at his workplace. (*Id*.). On examination, Claimant

demonstrated appropriate appearance and thought content; normal eye contact, motor activity, and speech; cooperative attitude; goal directed thought processes; alert sensorium; intact memory and concentration; above average intelligence; and fair judgment. (Tr. at 366-67). Dr. Dumas diagnosed Claimant with Tourette's disorder and an unspecified personality disorder for which he recommended "talk therapy." (Tr. at 368, 369).

Claimant presented to psychiatric mental health nurse practitioner Stacy Sheppard at Marshall Psychiatry and Behavioral Medicine on April 26, 2016. He explained that he was treated at Prestera Center for two months, but he did not like the atmosphere or providers. Regarding his symptoms, Claimant alleged that he hated to be around people; was indifferent; and slept 12 to 14 hours per day, staying awake at night to avoid most people, including his family members. (Tr. at 446).  Claimant denied having any tics. (Tr. at 448). He appeared appropriately dressed and adequately groomed. (Tr. at 449). His behavior was appropriate, calm, and cooperative, although he was also guarded and irritable. (*Id*.). Claimant expressed a hopeless, helpless, and negative attitude. (*Id*.). His thought processes and memory were intact, but his insight and judgment were poor. (*Id*.). Nurse Sheppard prescribed Zoloft and referred Claimant to a psychotherapist. (Tr. at 449-50). On May 24, 2016, Claimant told Nurse Sheppard that he felt the same, still hated everyone, and Zoloft was giving him horrible side effects. (Tr. at 442). However, he wanted to continue taking Zoloft in hope that the side effects would dissipate. (*Id*.).

On June 27, 2016, Claimant participated in his first therapy session with Kelly Daniel, M.A. He again expressed his intense dislike for people. (Tr. at 440). He said that he continued to try to find work, but never got "past an interview." (*Id*.). Claimant appeared disheveled and malodorous with stained clothing and hands. He stated that he

changed a tire and had not washed his hands. (Tr. at 441). Claimant did not have any tics or tremors. (*Id.*). Ms. Daniel diagnosed Claimant with anxiety and single episode major depressive disorder without psychosis. (*Id.*).

During a follow-up visit with Nurse Sheppard on July 6, 2016, Claimant reported that he had the same baseline symptoms since childhood. (Tr. at 436). He claimed that his symptoms were not improved by Zoloft, but the side effects of Zoloft had subsided. (*Id.*). Claimant appeared adequately groomed and appropriately dressed, and his behavior was appropriate, calm, and cooperative, yet guarded and irritable. (Tr. at 438). Nurse Sheppard increased Claimant's dosage of Zoloft and additionally prescribed Abilify. (Tr. at 439).

Claimant attended another counseling session with Ms. Daniel on July 7, 2016. He stated that he spent most of his time looking for jobs. (Tr. at 433). He described what he considered to be the idiocy of people, including people from school, his family, and employers. (*Id.*). Nevertheless, during his session with Ms. Daniel, Claimant was cooperative and pleasant, and he smiled appropriately, although he appeared anxious and guarded. (Tr. at 434). Claimant expressed the same mood and anxiety issues. (*Id.*). His thought process, insight, and cognition were normal, and his judgment was fair. (*Id.*). Ms. Daniel recorded that Claimant was responsive during the session and appeared to enjoy talking to her. (*Id.*). Later that month, on July 25, 2016, Claimant reported to Ms. Daniels that he experienced increased anger, paranoia, and suicidal thinking on Abilify. (Tr. at 431). Claimant exhibited appropriate, cooperative, and pleasant behavior, as well as good eye contact and impulse control, but he was agitated and appeared anxious. (Tr. at 432). He answered questions appropriately with normal speech, although he was loud at times. (*Id.*). Ms. Daniel diagnosed Claimant with single episode major depressive disorder

without psychosis, severe early onset dysthymic disorder in full remission with anxious distress and pure dysthymic syndrome, and anxiety. (*Id.*).

On September 12, 2016, Claimant met with therapist Denae Kuenzel, M.A. He expressed his frustration that he was unable to find a job in his field of network system security. (Tr. at 428). Claimant noted that he applied for some telemarking jobs, but he did not return phone calls to set up interviews. (*Id.*). He stated that "anyone can be a telemarketer," and he did not want to go back to work. (*Id.*). Claimant mentioned that he might instead file for disability benefits. (*Id.*). He was casually dressed, obese, and malodorous with dirty hands. (Tr. at 429). His mood and affect were abnormal. (*Id.*). However, despite those abnormalities, Claimant's behavior was appropriate, and he was cooperative with fair eye contact. (*Id.*). Ms. Kuenzel diagnosed Claimant with severe single episode major depressive disorder without psychosis and planned to follow-up with Claimant in six weeks for another therapy session. (*Id.*).

Claimant presented to psychiatrist Muhammad A. Muzaffar, M.D., in Nurse Sheppard's office on September 22, 2016. Claimant mentioned that he had certain personality traits that did not help him get along with others, such as his sarcastic attitude and humor. (Tr. at 424). He appeared disheveled, malodorous, and older than his stated age, and he was wearing stained clothing. (Tr. at 425). His mood and affect were abnormal, but Claimant maintained good eye contact and normal speech, and there were no issues regarding his thought content or processes, insight, concentration, orientation, language, or fund of knowledge. (Tr. at 424-26). Dr. Muzaffar diagnosed Claimant with severe single episode major depressive disorder without psychosis. (Tr. at 426). He discontinued Claimant's prescription for Zoloft and prescribed Effexor. (*Id.*).

On November 7, 2016, Claimant asked Ms. Kuenzel if he could transfer to a

different therapist. (Tr. at 421). He stated that she was not the right fit, and he needed a provider that was more directive rather than replying "okay" and "yes." (*Id*.). Claimant appeared adequately groomed, casually dressed, malodorous, anxious, suspicious, and guarded with poor eye contact. (Tr. at 422). Ms. Kuenzel diagnosed Claimant with depression with anxiety and planned to schedule him with a new therapist. (*Id*.).

Claimant reported to Dr. Muzaffar on November 18, 2016 that he continued to be sarcastic and irritable. (Tr. at 417). He again appeared disheveled and older than his stated age, and he was wearing stained clothing, but he maintained good eye contact. (Tr. at 418). Dr. Muzaffar re-prescribed Zoloft and planned to titrate the dosage after two weeks. (Tr. at 419). On December 13, 2016, Claimant presented to therapist Michelle Meese, M.A. He expressed a depressed mood related to not being able to find work. (Tr. at 414). Claimant stated that he had several interviews in his field, and he did not understand why the employers did not hire him. (*Id*.). He said that he acted "fake" in the interviews, behaving in the way that he believed the interviewers expected him to act. (*Id*.). Claimant told Ms. Meese that he felt cynical and believed that most people were lazy and worthless. (*Id*.). Ms. Meese diagnosed Claimant with major depressive disorder and anxiety. (Tr. at 415).

When Claimant returned to Dr. Muzaffar on January 17, 2017, he was less sarcastic and more focused, and he believed that he could work with his new therapist, Ms. Meese. (Tr. at 411). He exhibited the same appearance, but he was calm and cooperative with normal speech. (Tr. at 412). Dr. Muzaffar increased Claimant's dosage of Zoloft as planned. (Tr. at 413). On February 6, 2017, Claimant reported to Ms. Meese that his mood was slightly improved around the holidays because he spent time with his younger cousin. (Tr. at 408). He was unsure if the increase in Zoloft helped his mood. (*Id*.). He expressed

frustration with "how things were going in the country politically" and with customers at the pharmacy that he used. (*Id.*). Claimant demonstrated appropriate, calm, and cooperative behavior. (Tr. at 409). His diagnoses were unchanged, and he was scheduled to return in one month. (*Id.*).

On March 7, 2017, Claimant told Ms. Meese that his sister lost her job and already had another job opportunity. Claimant was frustrated because he had difficulty even getting job interviews. (Tr. at 405). Ms. Meese and Claimant discussed broadening his search beyond the job hunting sites that he tried. (Tr. at 406). Claimant appeared anxious, but was calm, cooperative, and pleasant with good eye contact, and he smiled appropriately. (Tr. at 406). Ms. Meese scheduled Claimant to return for therapy in three weeks. (*Id.*).

During his next visit with Ms. Meese on April 11, 2017, Claimant stated that he was anxious because he received a telephone call for an unscheduled interview, and he did not feel that the interviewer was familiar with information technology (IT) terminology and might not have had a good understanding of his answers to various questions. (Tr. at 402). Claimant was also anxious regarding signing up for food stamps, stating that he was worried that "something will happen," and he would lose the benefits that he already had if he was determined to be ineligible. (*Id.*). Claimant demonstrated the same general mental status, his diagnoses were unchanged, and he was scheduled to return for therapy in one week. (Tr. at 403).

On April 21, 2017, Claimant advised Dr. Muzaffar that he stopped taking Zoloft because he took it for one year, and he did not feel that it was helping. (Tr. at 399). Claimant mentioned that he was willing to try Wellbutrin. (*Id.*). Dr. Muzaffar observed twitching in Claimant's arm and shoulder and blinking. (*Id.*). He suggested Risperdal to

12

treat Claimant's anger and Tourette's symptoms, but Claimant was not willing to take the medication. (*Id*.). Dr. Muzaffar prescribed Wellbutrin. (Tr. at 401).

The next month, on May 1, 2017, Claimant reported to Ms. Meese that he suffered from more fluctuations in his anxiety, which he believed were caused by Wellbutrin. (Tr. at 560). Despite that complaint, Claimant demonstrated appropriate behavior during the session. (Tr. at 561). On May 15, 2017, Claimant asked Ms. Meese for a letter stating that he could not work, which he planned to submit in connection with his applications for food stamps and disability benefits. (Tr. at 557). Claimant was still calm, cooperative, and pleasant with good eye contact, and he smiled appropriately. (Tr. at 558). Ms. Meese suggested reducing the amount of time that Claimant spent monitoring the news because it exacerbated his mood. (Tr. at 557).

Claimant confirmed to Dr. Muzaffar on May 19, 2017 that his mood was improved on Wellbutrin. (Tr. at 554). He still had some mood swings and was now willing to try Risperdal. (*Id*.). Dr. Muzaffar renewed Claimant's prescription for Wellbutrin and prescribed Risperdal. (Tr. at 556).

During a subsequent session with Ms. Meese on June 2, 2017, Claimant was concerned that the medications were not helping his Tourette's symptoms. (Tr. at 551). However, he still demonstrated cooperative behavior and planned to continue therapy. (Tr. at 552-53). On June 19, 2017, Claimant told Ms. Meese that he was depressed and anxious because he had to start giving himself insulin injections to treat his diabetes. (Tr. at 548). He again displayed appropriate behavior and planned to continue therapy. (Tr. at 549). Claimant advised Ms. Meese on June 30, 2017 that he was frustrated with his primary care provider due to insurance issues and other matters. (Tr. at 545). However, Claimant related that he recently had an enjoyable time with his 10-year-old cousin who

visited. (*Id.*).

On July 25, 2017, Claimant told Dr. Muzaffar that he stopped taking Risperdal in mid-June because it was making him dizzy and drowsy. (Tr. at 542). Claimant was also no longer taking Wellbutrin, which Dr. Muzaffar re-prescribed in addition to continued therapy. (Tr. at 542, 544). Dr. Muzaffar advised Claimant that he was leaving the practice toward the end of the year and Claimant would be transferred to another provider. (*Id.*). Claimant seemed to "take it well." (*Id.*).

During his therapy session with Ms. Meese on July 28, 2017, Claimant continued to report depressed mood, but he stated that he traveled with his family to Savannah, Georgia to attend a cousin's wedding, and he enjoyed visiting with his family. (Tr. at 591). Claimant stated that his uncle shared how he coped with diabetes, which made him "feel better." (Tr. at 592). However, Claimant stated that another family member asked him about his depression, and he was surprised regarding her lack of knowledge concerning the condition. (*Id.*). He provided a terse response and removed himself from the situation before losing his temper. (*Id.*). Claimant was pleased that he set a boundary regarding what he was willing to share about himself. (*Id.*). Claimant said that he felt like a burden, was sad, and had a negative attitude. (*Id.*). His affect was congruently depressed and anxious. (*Id.*). However, Claimant demonstrated appropriate, calm, cooperative, and pleasant behavior with good eye contact, and he smiled and answered questions appropriately. (Tr. at 592). Claimant's speech was overly loud, but spontaneous, linear, logical, and goal directed with normal rate and rhythm. (*Id.*). Claimant also exhibited logical and goal directed thought process with no loosening of associations, insight into the nature of his illness and need for treatment, good judgment, intact memory and concentration, and full orientation in all spheres. (*Id.*). He was scheduled to follow up in

one month. (Tr. at 593).

On August 24, 2017, Claimant presented to a new therapist, Jennifer Price, Psy.D. He noted that he was more agitated on Wellbutrin, so Dr. Muzaffar instructed him to taper off and discontinue the medication until his next appointment. (Tr. at 588). Claimant expressed no interest in socializing, which he said was "typical for him." (Tr. at 589). He stated that he enjoyed watching television and movies and "keeping up with politics." (*Id.*). He further related that he lived with his family and got along with them. (*Id.*). Claimant's mental status was unchanged except his speech was normal volume, his eye contact was poor, he had limited insight into the nature of his illness and treatment, and fair judgment. (*Id.*). Claimant did not have any tics or tremors. (*Id.*). His diagnosis remained single episode severe major depressive disorder without psychosis. (*Id.*). Dr. Price scheduled Claimant to return for therapy in one month. (*Id.*).

Claimant presented to Dr. Muzaffar on September 19, 2017. He was cooperative, but he appeared anxious. (Tr. at 585). There were no major changes in his mental status or diagnosis. (Tr. at 585-86). Dr. Muzaffar prescribed Viibryd. (Tr. at 586). Thereafter, on October 13, 2017, Claimant told Dr. Price that he read about schizoid personality disorder and strongly identified with the symptoms. (Tr. at 581). He had some concerns regarding his drug therapy and intended to seek a new psychiatrist. (*Id.*). Claimant still demonstrated appropriate, calm, cooperative, and pleasant behavior with good eye contact, and he smiled and answered questions appropriately. (Tr. at 582). His speech was spontaneous, linear, logical, and goal directed with normal rate, rhythm, and volume. (*Id.*). Claimant also exhibited logical and goal directed thought processes, limited insight into the nature of his illness and need for treatment, fair judgment, intact memory and concentration, and orientation in all spheres. (*Id.*). He was scheduled to return for

15

therapy in two weeks. (*Id.*).

On November 3, 2017, Claimant told Dr. Price that he was not on medication because he was avoiding his psychiatrist due to a "misunderstanding regarding his food stamp benefits." (Tr. at 629). He stated that he always had few friends and preferred to visit at their homes rather than in public. (*Id.*). He noticed difficulty relating to others after entering the workforce, and he continued to isolate. (Tr. at 629, 630). He also had pronounced difficulty finding a job in his field, which contributed to his low self-esteem. (Tr. at 630). Dr. Price diagnosed Claimant with depression with anxiety. (*Id.*). There was no significant change in his mental status. (*Id.*).

Claimant followed up with Dr. Price on December 21, 2017. He stated that he was avoiding friends and family whose political beliefs "triggered a sense of dread." (Tr. at 627). Claimant also expressed feeling emotionally numb at another young friend's funeral. (*Id.*). Dr. Price diagnosed Claimant with severe early onset dysthymic disorder in full remission with anxious distress and anxiety. (Tr. at 628). Claimant then presented for a medication check with Ashley Collins, D.O., on February 7, 2018. (Tr. at 623). He reported that he felt the same and stopped taking Viibryd because he became more aggressive while taking it and would get upset over small issues. (*Id.*). Claimant complained that he did not enjoy anything and was distressed over his current living situation. (*Id.*). He reportedly slept during the day and stayed awake at night. (*Id.*). He said that he did not have any desire to be part of society and frequently avoided social situations because he "did not like people." (*Id.*). On examination, Claimant's energy was "ok," and he reported that he could function each day, but his mood was melancholic. (*Id.*). Claimant did not have any reported anxiety issues, and there was no significant change the remainder of his mental status examination findings. (Tr. at 623, 625). Dr.

16

Collins diagnosed Claimant with moderate major depressive disorder and schizoid personality disorder and prescribed Fetzima. (*Id.*).

On March 9, 2018, Claimant told Dr. Price that he was under increased stress due to "basement flooding." (Tr. at 633). He managed the repairs for his parents. (*Id.*). He also reported increased stress related to the disability benefits application process. (*Id.*). Claimant's diagnoses remained the same, and he was scheduled to return in one month. (*Id.*). Claimant presented to Gregory Parkins, D.O., regarding his various medical problems on March 23, 2018. Claimant told Dr. Parkins that he felt that he was "heading in the right direction" concerning anxiety and depression, and he liked his new psychiatrist. (Tr. at 638).

On July 12, 2018, Claimant reported to Dr. Price that he was engaging in more activities with his friend group. (Tr. at 751). However, he had some difficulty arguing with a conservative friend and felt that his other friends wanted him around for entertainment. (*Id.*). Dr. Price explored those beliefs in reference to Claimant's feelings about himself. (*Id.*). Claimant exhibited appropriate, calm, and cooperative behavior with normal speech, and he stated that he could enjoy things. (*Id.*). His affect was constricted, but he showed normal thought processes and insight, fair judgment, and intact memory and concentration. (*Id.*). Claimant's diagnoses were unchanged, and he was scheduled to return for therapy in one month. (*Id.*). Claimant told Dr. Price on August 30, 2018 that he continued to experience some conflict within his group of friends. (Tr. at 747). Dr. Price recorded that it still represented progress that Claimant was maintaining social relationships, even if they required more effort. (*Id.*). Claimant had some difficulty getting along with family members and was waiting for a determination regarding social security benefits. (*Id.*). His mental status was the same, and he was again scheduled to return in

one month. (Tr. at 748). On October 18, 2018, Claimant brought a questionnaire for Dr. Price to complete regarding his application for social security disability benefits. (Tr. at 744). There was still no significant change in his mental status. (Tr. at 745).

Claimant presented to Janice Hostetter, D.O., on November 7, 2018. He was again disheveled and malodorous, but his behavior was appropriate, calm, and cooperative; his speech was spontaneous, linear, logical, and goal directed with normal rate and rhythm; and he showed logical and goal directed thought processes with no loosening of associations, insight into the nature of his illness and need for treatment, fair judgment, intact memory and concentration, and orientation in all spheres. (Tr. at 742). Dr. Hostetter prescribed Lexapro and discontinued Claimant's prescription for Fetzima. (Tr. at 743). Claimant reported to Dr. Hostetter on January 2, 2019 that the full dose of Lexapro did not "do so great," causing decreased energy and sexual side effects. (Tr. at 759). Nonetheless, he was feeling "groovy." (*Id.*). There was no significant change in Claimant's mental status examination, and Dr. Hostetter prescribed Cymbalta. (Tr. at 761, 762).

The next day, on January 3, 2019, Claimant told Dr. Price that he was rejected by one of his friends and his other friends followed suit. (Tr. at 756). He struggled with it because reaching out and socializing with others was uncharacteristic of him. (*Id.*). Claimant also reported increased anxiety regarding his social security case. (*Id.*). However, there was no significant change in Claimant's mental status. He was still disheveled and malodorous, but displayed appropriate, calm, and cooperative behavior. (Tr. at 757). His speech was spontaneous, linear, logical, and goal directed with normal rate and rhythm. (*Id.*). He demonstrated logical and goal directed thought processes with no loosening of associations, insight into the nature of his illness and need for treatment,

18

fair judgment, intact memory and concentration, and orientation in all spheres. (*Id*.). Claimant was scheduled to return for therapy the following month. (*Id*.).

### B. Evaluations and Opinions

On May 27, 2017, state agency psychologist Debra Lilly, Ph.D., performed a psychiatric review technique based on her review of Claimant's records. She evaluated listings 12.04 and 12.06 concerning Claimant's mental impairments and determined that the evidence did not establish the presence of paragraph "C" criteria. (Tr. at 88-89). In that regard, she noted that Claimant was consistently alert and well oriented in his sessions and had more than one college degree. (Tr. at 89). Dr. Lilly acknowledged that Claimant interacted in a sarcastic and condescending manner at times, viewed himself as better than others, and stated that he did not care for others. (*Id*.). Therefore, she assessed that Claimant's social interactions would limit his ability to work in some settings, but she noted that he historically had been able to interact with others to obtain his needs. (*Id*.). (*Id*.). Dr. Lilly also assessed Claimant's mental RFC, concluding that Claimant did not have any understanding, memory, concentration, or persistence limitations, but marked limitation in social interaction. (Tr. at 93). She found that Claimant was markedly limited in interacting appropriately with the general public and moderately limited in accepting instructions and responding appropriately to criticism from supervisors and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 93-94). Dr. Lilly assessed that Claimant would require a work setting that would not require interactions with the general public or frequent interactions with coworkers or supervisors. (Tr. at 94). John Todd, Ph.D., affirmed Dr. Lilly's assessment on August 21, 2017. (Tr. at 118-19, 123).

On October 18, 2018, Dr. Price completed a questionnaire regarding Claimant's ability to perform work-related functions. She assessed that Claimant had slight impairment in functioning independently; moderate impairment in following work rules, using judgment, and maintaining attention/concentration; marked impairment in relating to co-workers and interacting with supervisors; and extreme impairment dealing with work stresses. (Tr. at 665). Dr. Price opined that Claimant did not have any impairment understanding, remembering, and carrying out simple, detailed, or even complex job instructions. (*Id.*). However, she concluded that Claimant had marked restriction in maintaining personal appearance, behaving in an emotionally stable manner, and relating predictability in social situations, and she found that he had an extremely limited ability to complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistence pace without an unreasonable number and length of rest periods. (Tr. at 666).

### C. Claimant's Statements

In a function report dated May 11, 2017, Claimant listed that his daily activities included performing household chores, driving family members to and from places, cooking his own meals, watching news broadcasts on television, and browsing the internet. (Tr. at 273). He did not have any impairment performing personal care; prepared simple meals; and completed yardwork, computer repair, and general repairs. (Tr. at 273-74). Claimant rarely went outside, and did not want to interact with people, but he could drive and go out in public alone. (Tr. at 275). He shopped for food and clothing independently. (*Id.*). Claimant did not socialize with others, did not get along with authority figures well, and had a "fear of the public." (Tr. at 276, 278). Claimant listed that he lost a job due to problems getting along with other people. (Tr. at 278). He

elaborated that in 2009 he inquired about the fact that he received less pay as a temporary employee for performing the same job as permanent employees, and he was laid off. (*Id*.). Claimant stated that he handled stress badly, but he handled changes in routine somewhat easily. (*Id*.).

On February 14, 2019, Claimant testified during his administrative hearing. He stated that he lived in a home with his parents and 29-year-old sister. (Tr. at 45). He drove locally, such as to doctor appointments and the grocery store, but he did not enjoy driving and usually drove at night to avoid people. (Tr. at 44). In terms of work history, Claimant worked for 12 to 15 hours per week as a community college tutor in 2014 and as a telephone customer service representative in 2007 and 2009. (Tr. at 45-47). On a daily basis, Claimant stated that he slept during the day and awoke at night to avoid other people. (Tr. at 49). He said that he did not like interacting with other people at all because they generally "let [him] down." (*Id*.). Claimant testified that he felt like a burden to his family and no longer talked to any of his friends. (Tr. at 50). He claimed that he had only had brief interactions with his family members. (Tr. at 56). Claimant testified that he prepared simple meals for himself, but his mother made more extravagant meals for him. (Tr. at 56-57). He occupied himself by watching television, Netflix, or movies, and reading news articles on the computer. (Tr. at 57-58).

## VI. **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.    <u>Discussion</u>

Claimant's challenges focus on his ability to interact with others. Each argument is discussed below, in turn.

### A. *Step Three*

Claimant contends that the ALJ erred in concluding that he did not qualify as disabled under listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar and related disorders), 12.08 (personality and impulse-control

disorders), and 12.15 (trauma- and stressor-related disorders).[1] (ECF No. 14 at 13-16). Claimant asserts that the consensus among the state agency psychologists and his treating psychologist that he had severe social limitations established that he had "marginal adjustment" sufficient to meet paragraph "C" of those listings.

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. §§ 404.1525, 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In the Fourth Circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a

---

[1] Listing 12.08 does not contain paragraph "C" criteria. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.08 (effective Mar. 11, 2018). However, the undersigned considers Claimant's challenge regarding the paragraph "C" criteria under listings 12.03, 12.04, and 12.15.

comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see also Ezzell v. Berryhill*, 688 F. Appx. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d at 1172-73) (internal markings omitted).

As is the case throughout the sequential evaluation process, the ALJ must set forth the reasons for the step three determination. *See, e.g.*, *Radford v. Colvin*, 734 F. 3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon*, 725 F.2d at 235). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."). Likewise, it is generally unacceptable for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing; the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence. *Radford*, 734 F.3d at 295. While an "ALJ is not required to explicitly identify and discuss every possible listing," the ALJ "is compelled to provide a coherent basis for [the] Step Three determination." *Ezzell*, 688 F. App'x at 200 (citation omitted).

In *Radford*, the Fourth Circuit found that an ALJ's step three analysis was "devoid of reasoning" and the ALJ's summary conclusion that the claimant did not meet a listing made it impossible for a reviewing court to evaluate whether substantial evidence supported the ALJ's findings. *Radford*, 734 F.3d at 295. However, the Fourth Circuit noted that a full explanation by the ALJ was particularly important in Radford's case because the medical record included a fair amount of evidence supportive of his claim; in fact, the record contained five years of medical examinations and probative evidence strongly suggesting that Radford met or equaled the relevant listing. *Id*. Similarly, in *Fox*, the Fourth Circuit found that the ALJ failed to explain the step three finding despite inconsistent evidence in the file, including a treating physician's numerous statements about the claimant's severe limitations, which possibly supported a finding that the claimant met the relevant listing. *Fox*, 632 F. App'x at 755 (4th Cir. 2015).

Despite the admonitions of the Fourth Circuit in *Radford* and *Fox* regarding an ALJ's duty of explanation at step three, "if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing].")). Indeed, "the ALJ need only review medical evidence once in his opinion." *Id*. at *4 (quoting *McCartney v. Apfel*, 28 Fed. Appx. 277, 279 (4th Cir. 2002)). Ultimately, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is

25

substantial evidence to support the conclusion." *Id.* (citing *Smith*, 457 Fed. Appx. at 328).

Simply put, the written decision must demonstrate that the ALJ adequately performed all of the key tasks required by the sequential disability evaluation process. When the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing, the ALJ's discussion is particularly important. Yet, "[i]f the court need not look beyond the ALJ's opinion to find substantial evidence supporting the ALJ's step-three determination, the ALJ's decision may be affirmed." *Marcum v. Berryhill*, No. CV 16-2297, 2017 WL 1095068, at *4 (S.D.W. Va. Mar. 23, 2017).

Claimant's challenge concerning listings 12.03, 12.04, and 12.15 all require a claimant to satisfy the medical criteria of paragraph "A," as well as paragraphs "B" or "C." Claimant argues that the evidence of record satisfies paragraph "C," which is the criteria to establish that a mental disorder is "serious and persistent." In order to satisfy the paragraph "C" criteria for listings 12.03, 12.04, or 12.15, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence of: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder and (2) marginal adjustment, meaning that the claimant has minimal capacity to adapt to changes in his or her environment or to demands that are not already part of his or her daily life. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.00(2)(c); 12.03(c); 12.04(c); 12.15(c).

The first subsection of paragraph "C," which requires ongoing medical treatment, means that the claimant obtained medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for the medical condition. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(G)(b). The second subsection of

the paragraph, which requires evidence of "marginal adjustment," means evidence that the claimant's adaptation to the requirements of daily life is fragile. *Id*. at § 12.00(G)(c). The SSA considers that a claimant has achieved only marginal adjustment when the evidence shows that changes or increased demands led to exacerbation of his or her symptoms and signs and to deterioration in his or her functioning. *Id*. For example, a claimant with marginal adjustment has become unable to function outside of his or her home or a more restrictive setting without substantial psychosocial supports. *Id*. Such deterioration may have necessitated a significant change in medication or other treatment. *Id*. Similarly, evidence may document episodes of deterioration that required the claimant to be hospitalized or absent from work, making it difficult for the claimant to sustain work activity over time. *Id*.

Claimant argues that his diagnoses and psychological treatment satisfied the durational and "ongoing treatment" portions of the listing, and "[t]he general agreement among two consultative examiners and [Claimant's] treating psychologist that he had markedly or extreme limitation in his ability to relate to the general public [and] moderate or marked limitations in dealing with coworkers or supervisors meets the last requirement" of the paragraph "C" criteria: a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. (ECF No. 14 at 14-16). The Commissioner does not dispute that Claimant received ongoing treatment, but he contends that there is no evidence of marginal adjustment, meaning that Claimant was unable to function outside of his home or required a structured setting.

At step three of the sequential evaluation, the ALJ noted Claimant's statements that he had trouble getting along with others, was fired from previous jobs because he had difficulty getting along with other people, had an "intense dislike of society," would "blow

up" at others, and liked to stay in his room. (Tr. at 20). The ALJ also cited that Claimant told his provider in 2017 that he had thoughts of harming others and reported in 2018 that he changed his sleep schedule to avoid people. (*Id*.). The ALJ also considered Claimant's mental status examinations, noting the fact that Claimant often displayed irritability and constricted affect, but the ALJ cited that Claimant was consistently cooperative with providers and exhibited good eye contact and normal speech. (*Id*.). Ultimately, the ALJ found that Claimant's ability to interact with others was markedly restricted. (Tr. at 20). However, the ALJ found that the paragraph "C" criteria were not satisfied. (Tr. at 21).

The ALJ's reasoning is further documented in the RFC analysis. The ALJ thoroughly discussed his consideration of the medical evidence, including Claimant's subjective allegations and numerous mental status examinations performed by his treating providers. (Tr. at 23-24). The ALJ noted that, despite some abnormal findings, including depressed mood, Claimant generally showed logical and organized thought processes, normal thought content, intact memory and concentration, and the ability to behave calmly, cooperatively, and pleasantly with good eye contact and normal speech. (Tr. at 24). Further, the ALJ cited that Claimant could perform household chores, yard work, and general repairs; drive family members "to and from places;" cook his own meals; complete personal care activities without difficulty; and shop for food and clothing. (*Id*.).

The ALJ also considered the opinion evidence in this matter, including the medical opinions of Claimant's treating psychologist, Dr. Price, and the prior administrative findings of the non-examining state agency psychologists, Dr. Lilly and Dr. Todd. The ALJ evaluated Dr. Price's opinion that Claimant had marked and extreme social limitations

and was moderately limited in using judgment and maintaining attention and concentration. (Tr. at 25). The ALJ determined that the opinion was somewhat supported by Dr. Price's objective findings of Claimant's depressed mood, constricted affect, and irritability. (*Id*.). However, the ALJ discussed that Dr. Price repeatedly reported that Claimant was cooperative, calm, and pleasant with good eye contact and normal speech, which was inconsistent with the extreme mental limitations in social functioning that Dr. Price assessed. (*Id*.). Furthermore, the ALJ noted that Dr. Price routinely reported that Claimant's memory was intact and other providers documented Claimant's adequate grooming, appropriate behavior, good eye contact, normal speech, fair judgment, intact memory and concentration, and normal thought processes. (*Id*.). The ALJ additionally considered that Dr. Price changed her diagnoses several times during treatment. (*Id*.). Based on the foregoing, the ALJ found that Dr. Price's opinion was not persuasive. (*Id*.).

Regarding the prior administrative findings, the ALJ cited that the state agency non-examining psychologists, Dr. Lilly and Dr. Todd, concluded that Claimant required a work setting that did not require interaction with the general public or frequent interaction with coworkers and supervisors. (Tr. at 25). The ALJ concluded that the consultants' findings were persuasive because they were supported with adequate explanation and were consistent with the evidence, including Claimant's reported thoughts of harming others, intense dislike of others, irritability, and constricted affect. (*Id*.).

Given the above, the ALJ very clearly considered all of the evidence in order to determine that Claimant did not have marginal adjustment.  Claimant does not point to any evidence that the ALJ overlooked or demonstrate that the ALJ misapplied the law in any manner. In fact, the ALJ considered the evidence cited by Claimant and explained

that, although Claimant's ability to interact with others was markedly restricted, Claimant interacted appropriately with his providers, drove and shopped independently, cared for himself without difficulty, and performed household chores and repairs. The ALJ's analysis is supported by more than a scintilla of evidence. As the ALJ cited, despite Claimant's marked social limitations, Claimant routinely attended doctor appointments and interacted cooperatively and pleasantly with providers, he could go out in public independently to attend doctor appointments and shop for groceries and clothing, had no trouble performing personal care, and performed some household tasks and repairs. (Tr. at 403, 406, 409, 412, 418, 425-26, 429, 432, 434, 438, 449, 366-67, 549, 552-53, 558, 561, 582, 592, 742, 745, 748, 751, 757, 761). The evidence failed to document evidence of marginal adjustment, such as Claimant's inability to function outside of his home without substantial psychosocial supports or episodes of deterioration that required Claimant to be hospitalized or absent from work.

Moreover, although Claimant relies upon the opinions of the state agency psychologists to support this challenge, both experts found that the evidence did not establish the presence of paragraph "C" criteria. The psychologists agreed that, despite his social limitations, Claimant was consistently alert and well oriented in his sessions, obtained more than one college degree, and was able to interact with other to obtain his needs. (Tr. at 89, 118). While Claimant may disagree with the ALJ's conclusions, the ALJ's findings are supported by the evidence of record.

For the above reasons, the undersigned **FINDS** that the ALJ's step three analysis complied with the law and was supported by substantial evidence.

### B. Weight of Opinions

Claimant further contends that the ALJ did not give proper weight to the medical

opinions of his treating psychologist, Dr. Price. (ECF No. 14 at 11). However, it is important to note that the manner in which the SSA evaluates opinion evidence has changed dramatically in recent years. Previously, a treating source's opinion was entitled to special deference as an ALJ assigned specific weight to the medical opinions in the record. However, for applications such as Claimant's filed on or after March 27, 2017, an ALJ is no longer required to defer or give any specific evidentiary weight, including controlling weight, to any medical opinions, including those from Claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ evaluates the persuasiveness of all medical opinions using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors that tend to support or contradict the medical opinions. *Id*. §§ 404.1520c(c), 416.920c(c). Under the current regulations, the most important factors for the ALJ to consider are the supportability and consistency of the opinions, as opposed to whether or not the source treated the claimant. *Id*. §§ 404.1520c(a), 416.920c(a).

In this case, the ALJ evaluated Dr. Price's opinions as previously noted. The ALJ found that the extreme social limitations that Dr. Price assessed were inconsistent with her own treatment notes, as well as the numerous mental status examinations by other providers. Claimant disputes that Dr. Price's opinions were inconsistent with her treatment notes. (ECF No. 14 at 15). However, Claimant does not cite to any records to support that point. (*Id*.). Furthermore, the sole issues before the Court are whether the ALJ correctly applied the law and whether substantial evidence supports his analysis of Dr. Price's opinion. It was the province of the ALJ, not Claimant or this Court, to evaluate the persuasiveness of Dr. Price's opinion. Here, the ALJ found that the degree and severity of limitations that Dr. Price assessed were inconsistent with the numerous normal mental

status examination findings. Indeed, the record is replete with notations by Dr. Price and other providers regarding Claimant's calm, cooperative, and pleasant behavior; good eye contact and appropriate answers to questions; intact memory and concentration; logical and goal directed thought processes with no loosening of associations; and linear and logical speech. (Tr. at 403, 406, 409, 412, 418, 425-26, 429, 432, 434, 438, 449, 366-67, 549, 552-53, 558, 561, 582, 592, 742, 745, 748, 751, 757, 761). Therefore, the record supports the ALJ's assessment.

Claimant further argues that the ALJ should not have discredited Dr. Price's opinions because Dr. Price changed Claimant's diagnoses several times during the course of treatment. However, Claimant again fails to show any error in the ALJ's analysis. The ALJ was tasked with evaluating the persuasiveness of Dr. Price's opinions. The fact that Dr. Price's diagnoses of Claimant changed multiple times in the 18 months that she counseled Claimant was relevant to that inquiry. Finally, Claimant points out that, even under the new regulations, the ALJ must still consider the medical source's relationship to the claimant and specialization in evaluating the persuasiveness of the opinion. However, the ALJ very clearly noted that psychologists Dr. Lilly and Dr. Todd were medical consultants whereas Dr. Price was Claimant's treating provider. It is unclear what further discussion was required. It is evident from the text of the decision that the ALJ considered the persuasiveness of the medical opinions in accordance with all of the regulatory factors, appropriately focusing on the supportability and consistency of the opinions.

Therefore, the undersigned **FINDS** that the ALJ properly evaluated the medical opinions in this matter, and his analysis is supported by substantial evidence.

### C.  RFC

Finally, Claimant argues that, even if the ALJ properly weighed the evidence, his RFC was inadequate because Dr. Lilly and Dr. Todd opined that Claimant could not have any contact with the public, yet the ALJ assessed that he could have no more than superficial contact with the public. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the *most* that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.*  Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing

specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Here, the ALJ thoroughly cited Claimant's allegations, treatment records, objective findings, test results, daily activities, and the various opinions offered in this matter. (Tr. at 22-25). The ALJ also considered the prior administrative findings by Dr. Lilly and Dr. Todd, and he found them to be persuasive. However, contrary to Claimant's suggestion, the ALJ was not mandated to adopt the precise limitations that Dr. Lilly and Dr. Todd assessed. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1) (stating that the ALJ must consider any prior administrative medical findings as appropriate, but the ALJ is not required to adopt the findings, as the ALJ is responsible for reviewing the evidence and making administrative findings of fact and conclusions of law).

It was the ALJ's duty to perform the function-by-function analysis and determine Claimant's RFC. The ALJ performed that analysis and explained his reasoning. The ALJ found that Claimant had marked limitations in interacting with others, along with decreased concentration, frustration, and poor hygiene, due to adjustment disorder and personality disorder. (Tr. at 26). Therefore, the ALJ assessed that Claimant was limited

to no more than superficial contact with the public in the workplace in addition to other restrictions. (*Id.*).

As the ALJ explained, Claimant's ability interact with others was severely impaired, but he was able to interact with others to a certain extent to meet his needs, including routinely attending medical appointments during which he interacted appropriately, going out in public alone to shop for groceries and clothing, and driving his family members to and from places.

There is no legal requirement that each limitation that an ALJ assessed be based on a certain medical opinion or prior administrative finding. In this case, the ALJ considered all of the evidence, including all relevant conflicting evidence, and determined that Claimant could perform jobs that required no more than superficial contact with the public. The ALJ's findings were supported by Claimant's treatment records, function reports, and other evidence. Moreover, Claimant does not offer any argument or evidence that a restriction to no public contact would preclude him from performing all of the jobs that the ALJ relied upon at step five, including the positions of commercial cleaner, night cleaner, garment bagger, routing clerk, inspector, and sorter.

Consequently, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF Nos. 14); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 19); **AFFIRM** the decision of the Commissioner;

**DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:   May 17, 2021

Cheryl A. Eifert
United States Magistrate Judge